Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| PRADERAS DEL RÍO, INC. ET AL.<br><br>Apelantes<br><br>V.<br><br>AUTORIDAD DE CARRETERAS DE PUERTO RICO ET AL.<br><br>Apelados | KLAN202500514 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Caso Núm.:<br>J DP2017-0023<br><br>Sobre:<br>Reclamación de daños y acciones correctivas |
|---|---|---|

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio y el Juez Marrero Guerrero.

Marrero Guerrero, Juez ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 20 de noviembre de 2025.

Comparece Praderas del Río, Inc., el Sr. Adrián Mercado Vizcarrondo y su esposa, la Sra. Mariangelie Berlingeri Marín y la sociedad legal de gananciales compuesta por ambos, la Sra. Sylvia Teresa Méndez Álvarez y, la Sra. Enita Luz Moure De Liz (en conjunto, parte apelante) mediante un escrito intitulado *Recurso de Apelación* en el que nos solicita que revoquemos la *Sentencia* emitida el 31 de marzo de 2025[1] por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI). Allí, el foro primario declaró No Ha Lugar a la *Demanda* presentada por dicha parte por estar prescrita. En consecuencia, desestimó la misma con perjuicio respecto a Cantera El Tuque (Cantera o apelada) y su aseguradora, Universal Insurance Company (Universal o apelada), y las demás partes desconocidas. En cuanto a Ferrovial Agroman S.A. (Ferrovial o apelada) y Universal, su aseguradora, indicó que, en la eventualidad de que la *Demanda* no estuviese prescrita, estos no tenían responsabilidad alguna por los

---

[1] Archivada y notificad en autos el 7 de abril de 2025.

daños que hubiese ocasionado a terceros la subcontratista independiente, Cantera. Además, concedió a la parte apelada la suma de $2,000.00 por concepto de costas, gastos y honorarios de abogado.

Por los fundamentos que expondremos a continuación, se revoca la determinación apelada y se devuelve al foro primario para la continuación de los procedimientos.

-I-

El caso que nos ocupa se originó el 1 de febrero de 2017, cuando la parte apelante presentó una *Demanda* sobre acción civil para reclamar daños y acciones correctivas en contra de la parte apelada. Tras varios trámites procesales que resulta innecesario pormenorizar aquí, el 21 de febrero de 2019 la parte apelante presentó una *Segunda Demanda Enmendada.*[2] En esencia, alegó que, era dueña en común proindiviso de una finca de 13.664 cuerdas ubicada al lado de la Urbanización Valle de Andalucía, en Ponce, Puerto Rico. Además, manifestó que, su finca colindaba con una servidumbre o *right of way* con la Carretera PR-9, y por el norte con la finca del Sr. Víctor Cales Fraticcelli (señor Cales). Sostuvo que la Autoridad de Carreteras de Puerto Rico (Autoridad de Carreteras) estaba construyendo en carretera PR-9 en conjunto con Ferrovial, como contratista general, y Cantera, como subcontratista a cargo del movimiento de tierras del proyecto. Arguyó que, Ferrovial determinó disponer y reubicar, fuera de los predios del proyecto, alrededor de 40,000 metros cúbicos de terreno sobrante de la construcción de la carretera PR-9. Aclaró que, dicha labor fue encomendada a Cantera, quien a su vez solicitó al señor Cales que permitiera el depósito de dicho material en su finca. No obstante, adujo que, para el mes de mayo de 2014 Cantera procedió a depositar el material en su finca sin contar con su autorización.

---

[2] Apéndice del *Recurso de Apelación Civil,* Anejo 1, págs. 1-17.

Cónsono con lo anterior, esbozó que su finca sufrió graves daños, toda vez que el relleno invadió casi la totalidad de la propiedad y afectó su entorno topográfico y el drenaje natural de las aguas de escorrentías. Por tanto, razonó que, su finca quedó inutilizada para su desarrollo ulterior. Además, esgrimió que la Autoridad de Carreteras incumplió con su deber de supervisión a los fines de evitar errores en la construcción. A su vez, señaló que, el señor Cales debió identificar con precisión las colindancias de su finca para delimitar el depósito del relleno. En virtud de lo anterior, razonó que, la parte apelada eran responsables de manera solidaria por las actuaciones negligentes y los daños causados a su finca.

En respuesta, el 8 de mayo de 2019, Cantera presentó su *Contestación a Segunda Demanda Enmendada*.[3] En esta, negó la mayoría de las alegaciones. Además, aceptó que depositó el sobrante de la construcción en el terreno en una finca que no pertenecía al señor Cales. Sin embargo, aclaró que, la parte apelante no reclamó hasta la presentación de la *Demanda*. Por tanto, razonó que la *Demanda* podía estar prescrita. Adicionalmente, destacó que, la parte apelante no alegó una fecha cierta en la cual ocurrieron los hechos. Sostuvo que dicha omisión conllevaba la desestimación del caso.

Por su parte, el 13 de mayo de 2019, Ferrovial presentó su *Contestación a Demanda Enmendada* negando la mayoría de las alegaciones. A su vez, presentó sus defensas afirmativas.[4] En lo pertinente, argumentó que, la obra de construcción fue ejecutada y completada conforme a los mejores estándares de construcción, en cumplimiento con lo pactado y sujeta a inspecciones. Enfatizó que, de haber ocurrido los presuntos actos negligentes, estos eran responsabilidad de Cantera, puesto que dicha empresa fue contrada para la remoción y disposición del terreno sobrante. Añadió que, la

---

[3] *Íd.,* Anejo 4, págs. 25-27.
[4] *Íd.,* Anejo 2, págs. 18-21.

causa de acción estaba prescrita. De igual forma, el 31 de mayo de 2019, Universal presentó su *Contestación a Segunda Demanda Enmendada*.[5] Al igual que Cantera y Ferrovial negó la mayoría de las alegaciones. Reiteró que, la parte apelante no reclamó hasta la presentación de la *Demanda*, por lo que la misma estaba prescrita. Finalmente, expuso que la parte apelante no alegó una fecha cierta en la cual ocurrieron los hechos, por lo que procedía la desestimación del caso.

Luego varias incidencias procesales, el 19 de abril de 2021, las partes presentaron su *Informe Preliminar entre Abogados Para la Conferencia con Antelación a Juicio*.[6] Celebrado el juicio en su fondo el 17 y 18 de octubre de 2023, la apelada solicitó la desestimación de la *Demanda* en corte abierta al amparo de la Regla 39.2 (C) de Procedimiento Civil, 32 LPRA Ap. V, R. 39.2 (C).[7] Cónsono con lo anterior, el Tribunal concedió a la parte apelada hasta el 20 de noviembre de 2023, para presentar su moción de desestimación.

En cumplimiento con lo anterior, el 20 de noviembre de 2023, la parte apelada presentó su *Moción de Desestimación Contra la Prueba al Amparo de la Regla 39.2(C) de las de Procedimiento Civil*.[8] En síntesis, alegó que, para el 2014 la parte apelante tenía conocimiento del depósito de material y quién lo había depositado. Ello, a pesar de que, en la primera demanda enmendada arguyó que, para el 2016 advino en conocimiento de que en su finca se depositó una gran cantidad de relleno sin su autorización. A su vez, resaltó que la parte apelante acompañó su *Segunda Demanda Enmendada* con una carta suscrita por el ingeniero Oscar Santiago, jefe de obra de Ferrovial, la cual indicaba que, los movimientos de tierra se realizaron entre los meses de febrero y junio del año 2013. Asimismo,

---

[5] *Íd.,* Anejo 3, págs. 22-24.
[6] *Íd.,* Anejo 5, págs. 28-47.
[7] *Íd.,* Anejos 6-7, págs. 48-57.
[8] *Íd.,* Anejo 8, págs. 58-71.

arguyó que, la prueba desfilada en el juicio demostró que el depósito de material se efectuó entre los meses de febrero y junio de 2013 y, que para el 2014 la parte apelante tenía conocimiento del material depositado y quién lo depositó.

Por otra parte, esbozó que, la parte apelante no logró probar que realizó gestiones afirmativas a los fines de interrumpir el término prescriptivo. Entiéndase que, la parte apelante realizó un reclamo por primera vez a más de cuatro (4) años desde que ocurrieron los hechos. Respecto a la responsabilidad del daño causado, resaltó que la parte apelante falló en establecer los elementos de dicha causa de acción. Particularmente, manifestó que estos dejaron de establecer la negligencia y responsabilidad de las partes encargadas de la obra. Por todo lo anterior, sostuvo que procedía desestimar la *Demanda* por estar prescrita.

En desacuerdo, la parte apelante presentó su *Moción en Oposición a la Solicitud de Desestimación al Amparo de la Regla 31.2 (C) de las de Procedimiento Civil Planteada y Radicada por la Parte Demandada.*[9] En esencia, adujo que, la colocación negligente de material de relleno en su finca configuró un daño continuo mientras no se remueva dicho material y se devuelva la finca a su estado original. Sostuvo que la prescripción no comenzaba a transcurrir mientras la perturbación estuviese vigente. Respecto a los daños, reiteró que el depósito de dicho material tenía unos efectos dañinos en su finca que impedían su uso y desarrollo. Además, apuntó que la negligencia de la parte apelada era evidente. Finalmente, señaló que el contratista general tenía el deber de supervisar a sus empleados y subcontratistas, por lo que el error cometido por Cantera pudo haber sido evitado por Ferrovial. En virtud de lo anterior, solicitó que el TPI

---

[9] *Íd.,* Anejo 9, págs. 72-79.

declarara no ha lugar la moción de desestimación y, dictara sentencia ordenando la remoción del material de relleno.

Tras dar por sometido el asunto ante su consideración, el 31 de marzo de 2025, el TPI emitió su *Sentencia* en la cual declaró No Ha Lugar la *Demanda* según enmendada.[10] En consecuencia, desestimó la *Demanda* con perjuicio en cuanto a Cantera, Universal, y las aseguradoras desconocidas. Ello por estar prescrita. Respecto a Ferrovial, indicó que, si la *Demanda* no estaba prescrita, estos no tenían responsabilidad alguna por los daños que hubiese ocasionado a terceros la subcontratista, Cantera. Cónsono con lo anterior, condenó a la parte apelante al pago de costas, gastos y honorarios por la suma de $2,000.00. A su vez, formuló las siguientes determinaciones de hechos:

### Hechos Estipulados por las Partes en el Juicio

1. El representante de Praderas del Río, Sr. Adrián Mercado Vizcarrondo, conoció en el 2014, que se había depositado relleno en el área del, terreno objeto de esta Demanda.

2. Al 2014 el representante de Praderas del Río, Sr. Adrián Mercado Vizcarrondo, conoció que el contratista del proyecto de la Autoridad de Carreteras, PR-9, era Ferrovial y que Cantera El Tuque, representada por el Sr. Enrique Golderos, fue quien hizo el movimiento de terreno como subcontratista.

### Hechos Estipulados en el Informe Preliminar entre Abogados

1. La parte demandante es dueña de una finca que colinda con la Urbanización Villas de Andalucía y con la Carretera PR-9 en construcción en Ponce, Puerto Rico.

2. El proyecto de construcción en la Carretera PR-9 que se lleva a cabo por la Autoridad de Carreteras de Puerto Rico fue adjudicado y contratado con Ferrovial Agroman, como contratista general, quien a su vez subcontrató a Cantera El Tuque, Inc., para que efectuara los movimientos de tierra necesarios para la ejecución de dicha obra.

3. En determinado momento, el contratista general le requirió a dicho subcontratista que extrajera y dispusiera en otro lugar determinadas cantidades de material de relleno sobrante de la obra. Para ello, la codemandada, Cantera El Tuque, Inc., tramito y obtuvo

---

[10] *Íd.,* Anejo 10, págs. 80-97. Archivada y notificada el 7 de abril de 2025.

un permiso del Sr. Víctor Cales Fraticelli para depositar dicho relleno en su finca, la cual colinda con el lado norte de la de los demandantes.

4. Por error involuntario, admitido por dicho subcontratista, Cantera El Tuque, Inc., depositó de (el) relleno en la finca de los demandantes creyendo que lo hacía en la del Sr. Cales Fraticelli, cuyo consentimiento había obtenido previamente.

   En la Vista en su Fondo, las partes anunciaron las siguientes estipulaciones adicionales, que surgen de la deposición utilizada:

5. El representante de Praderas del Río, el Sr. Adrián Mercado Vizcarrondo, conoció en el 2014 que se había depositado relleno en área de terreno objeto de esta Demanda.

6. Al 2014, el representante de Praderas del Río, Adrián Mercado Vizcarrondo, conocía que el contratista del proyecto de la Autoridad de Carreteras, PR 9, era Ferrovial y que Cantera El Tuque, representada por Enrique Golderos, fue quien hizo el movimiento de terreno, como subcontratista.

**Hechos que este Tribunal Concluye Probados por el Expediente y la Prueba Aportada en el Juicio**

1. En el presente caso, la Demanda se presentó formalmente el 1ro de febrero de 2017.

2. El testigo de la parte demandante, Rafael Rodríguez Zayas, se dedica a la gestoría de proyectos de construcción y de desarrollo.

3. Con relación a la codemandante, Praderas del Río, Rodríguez Zayas fue contratado en el año 2012 para desarrollar un proyecto en la finca que colinda por el Norte con la Urbanización Villas de Andalucía, en Ponce.

4. Rodríguez Zayas tomó conocimiento, en algún momento en el año 2014, que se depositó el relleno erróneamente, por una llamada telefónica que recibió de su Presidente, el Sr. Adrián Mercado Vizcarrondo. Con motivo de ello se movilizó a la finca y corroboró la existencia del terreno.

5. A raíz de ello, el señor Rodríguez Zayas se comunicó con el Sr. Enrique Golderos, Presidente de Cantera El Tuque, sobre el depósito del relleno.

6. El mismo día, comparecieron a una reunión "informativa," el Ing. Oscar Santiago, que representaba a Ferrovial, Contratista General del Proyecto de la Autoridad de Carreteras PR 9, el Sr. Enrique Golderos y el señor Rodríguez Zayas, Golderos representaba a Cantera El Tuque, como subcontratista de Ferrovial, se informó el error al Ing. Oscar Santiago y acordaron reunirse posteriormente con los representantes del Sr. Adrián Mercado, En corte abierta, el testigo expresó que

la reunión se llevó a cabo para el mes de junio de 2016, en la oficina del Lcdo. Samuel Torres Cortés. Confirmó que estuvieron presentes el Ing. Oscar Santiago, Edwin Ortiz, una licenciada de la compañía constructora, Adrián Mercado Vizcarrondo, el Lodo. Samuel Torres y el propio Rodríguez Zayas.

7. El testigo confirma que se tomó un acuerdo, a los fines de que Cantera El Tuque, iba a mover el material. Se hizo el movimiento de una máquina para comenzar a sacar el terreno, para moverlo según se habló a la finca de un colindante, que ya tenía el permiso para ello. Estuvieron allí como por una semana, para mover un poco de tierra, sin sacarla de la finca, pero eso fue todo.

8. El testigo Rodríguez Zayas sostiene que se comunicaron muchas veces, con el propósito de que se terminara el trabajo, pero no se terminó, porque se alegaba la falta de dinero.

9. El Sr. Rafael Rodríguez Zayas corrobora que, a esta fecha, el terreno está intacto, refiriéndose al depósito de relleno.

10. A preguntas en el contrainterrogatorio y al ser confrontado con la deposición que le fuera tomada, el señor Rodríguez Zayas, el 25 de septiembre de 2019, sostuvo que la primera reunión con el señor Golderos fue entre el año 2015 y 2016, o sea tres o cuatro años previos a la deposición. Sostuvo que fue en el año 2014 que se informó de la situación al Sr. Adrián Mercado Vizcarrondo. El señor Rodríguez Zayas citó al señor Golderos a la reunión en la oficina del licenciado Torres. De igual manera, el testigo confirmó que se habló del depósito de relleno en la finca equivocada y nada más.

11. El Sr. Rafael Rodríguez Zayas repasó, conforme a la deposición, que primero tuvo una reunión con el Sr. Enrique Golderos y el Lcdo. Samuel Torres, celebrada en la oficina de dicho letrado. El testigo no estableció la fecha cierta de la reunión y se limitó a indicar que lo que podía precisar era que la reunión había sido tres o cuatro años atrás, o sea, para los años 2015 o 2016.

12. En esa reunión, el testigo estableció que se habló por primera vez del asunto del error en el depósito de relleno en la finca de los demandantes, según su recuerdo.

13. El señor Rodríguez Zayas no pudo precisar fecha cierta, pero indicó haber comunicado al Sr. Adrián Mercado Vizcarrondo sobre esta situación, "a lo mejor de dos a tres semanas antes de reunirnos."

14. El segundo testigo de la parte demandante, Oscar Enrique Santiago Diaz, es ingeniero civil de profesión, trabajaba para Ferrovial Agroman y se desempeña como gerente de proyectos. Se trata de una empresa española.

15. Entre las funciones de un gerente de proyectos, en el presente caso del proyecto de la Autoridad de Carreteras, en la PR 9, se administra, gerencia el proyecto completo en la construcción, plasmar los planos y especificaciones del proyecto para hacerlos realidad.

16. Cuantos contratistas exactamente trabajan el proyecto, no lo conoce exactamente, ya que son varias especialidades, menciona asfalto, pavimento de hormigón, la calzada final de la carretera, movimiento de tierra.

17. El movimiento de tierra en este proyecto, se subcontrató con Cantera El Tuque, Inc., subcontratista independiente. Dicho Subcontrato de Obras se suscribió el 27 de septiembre de 2012.

18. Cantera El Tuque, Inc., estipuló en el Subcontrato haber visitado el lugar donde ejecutaría los trabajos, examinado las condiciones del mismo, haber confirmado la existencia y localización de los servicios afectados. Además, de aparecer condiciones físicas diferentes de las previstas en el lugar sobre el que se ejecutarán los trabajos subcontratados, dicho subcontratista, no tendría derecho a compensación alguna.

19. El contratista, Ferrovial, podía solicitar al subcontratista, Cantera El Tuque, Inc., en cualquier momento, que descubriera cualquier parte de la obra ejecutada del trabajo subcontratado para su inspección, estando la subcontratista obligada a hacerlo. Si la inspección revelaba que el trabajo no cumplía las órdenes del contratista, el subcontratista sería responsable de todos los costes y tiempo del descubrimiento, corrección y restauración del trabajo para que éste cumpla lo establecido.

20. La decimocuarta cláusula del Subcontrato dispone que: "Serán de exclusiva cuenta del Subcontratista el importe de todos los daños y perjuicios que con motivo de la ejecución de los trabajos subcontratados se originen a cualquier tercero."

21. Ferrovial y Cantera El Tuque, Inc., acordaron resolver las controversias, en forma amistosa, y en los casos en que no pudiera resolverse de esa forma, las partes acordaron someterse al proceso de arbitraje.

22. Como parte de las labores subcontratadas se encontraban la disposición de material sobrante, cortar el terreno en áreas, rellenar internamente el terreno y disponer del sobrante de terreno. Se cargan camiones y el camión lo lleva a un lugar conocido como "botadero," palabra que viene de los españoles.

23. En los proyectos de construcción, hay un permiso general consolidado, en este caso, se moviliza el relleno a un lugar y hay que saber ese lugar que se regula en el permiso de construcción.

24. En sus comienzos, en este proyecto, había dos lugares y eventualmente tres como botaderos con permiso para Cantera El Tuque.

25. Las funciones del ingeniero, con respecto a la supervisión en la ejecución de las tareas subcontratadas con Cantera el Tuque, contratista de su empresa Ferrovial, era verificar costos, corte el terreno, que se cortara la cantidad correcta y certificar para pagos.

26. Respecto a las funciones relacionadas a la disposición correcta del material a un botadero, el Contratista General Ferrovial, no tiene jurisdicción, ya que es totalmente fuera del proyecto. Entre las funciones y precauciones suyas, no estaba descartar o algún tipo de corroboración de que se depositara en una finca distinta, no dispone que se le tiene que dar evidencia, son lugares fuera del proyecto, no tenía que seguir donde se iba a depositar. En los permisos ambientales con contrato, cuando se trata hormigones o demoliciones le tienen que entregar evidencia, pero en terreno natural no le compete.

27. El testigo no recuerda la fecha exacta en la que se entera por primera vez que Cantera El Tuque reconoció que se equivocó en el lugar donde depositó el relleno, si recuerda saber que se había equivocado.

28. Recuerda conversaciones no fechas.

29. Recuerda que la reunión en la oficina del licenciado Torres, en cuanto a Ferrovial fueron como oyentes de buena fe, por ser un subcontratista y se acordó subsanar lo que se había hecho.

30. El personal de Ferrovial continuó las conversaciones con el señor Golderos, representante de Cantera El Tuque, sobre la solución al problema, maneras o métodos no, se determinó que iban a sacar el material y pensando que lo iba a hacer.

31. El ingeniero Santiago Díaz, se mantuvo como gerente de proyecto, hasta después del paso del Huracán María, el día 20 de septiembre de 2017, estuvo alrededor de seis meses a un año más, para principios del año 2018 cuando fue movido a otro proyecto y, realmente, lo que había escuchado sobre el movimiento de terreno es que no se había hecho nada.

32. No correspondía a Ferrovial cerciorarse de la labor encomendada al contratista.

33. A preguntas en el contrainterrogatorio, el testigo informó que el material que se cortaba y se sacaba del proyecto se puede utilizar de relleno en el mismo proyecto u otra parte. Es corte de terreno natural.

34. Se cursó más de una carta al señor Golderos para solicitar el permiso depósito de material en el lugar de

la controversia. Véase de julio de 2014. estipulaciones sobre las cartas fechadas, 21 de febrero de 2013 y de Julio de 2014.

35. Estas cartas se cursan al señor Golderos, cuando el ingeniero Santiago Díaz, se dio cuenta del depósito de relleno, por fotos aéreas, ya que tenían contratado para mensualmente obtener las fotos aéreas que amplían el perímetro del proyecto, [contiguo] al proyecto, las fotos tienen fechas y se ve el área que va cambiando de color. Sabía que no eran los lugares designados para botar material.

36. Las fotos aéreas se tomaron para Ferrovial, desde el día 29 de enero al 28 de octubre de 2013.

37. Se remitió una carta a Cantera el Tuque, por Ferrovial, porque notaron el cambio. Al ingeniero Santiago Díaz le llamó la atención de alguna forma y solicitó los permisos, para evidenciar que tenían permiso de botaderos, esas acciones suyas las lleva a cabo como parte de sus obligaciones.

38. Para el 26 de febrero de 2013, surge de las fotos que en la finca de los demandantes se había depositado relleno sobrante.

39. Para junio de 2013 puede identificarse en las fotos que paró el depósito de relleno.

40. Los movimientos de tierra sobrante, en el proyecto de la Carretera PR-9, se realizaron entre los meses de febrero a junio de 2013.

41. El 21 de febrero de 2013, Ferrovial solicitó al Sr. Enrique Golderos, mediante comunicación suscrita por el Jefe de Obra, Oscar E. Santiago Díaz, a Cantera El Tuque, el permiso tramitado para el depósito de material, producto del corte, en los terrenos colindantes al proyecto.

42. Posteriormente, el 24 de julio de 2024, se remite por Ferrovial una segunda comunicación a Cantera El Tuque, en referencia a la carta del 21 de febrero de 2013. Se hace constar que Ferrovial no recibió el permiso emitido por el Municipio Autónomo de Ponce, tramitado sobre el depósito de material producto del corte de terreno.

43. Las acciones tomadas por el ingeniero Santiago Díaz, por Ferrovial, fueron a los fines de solicitar el permiso al señor Golderos, porque Cantera El Tuque había designado los botaderos y no se identificaba la finca en que depositó el terreno.

44. Por último, este Tribunal toma conocimiento judicial del Caso Civil Número KEF2011-0240, sobre Expropiación Forzosa, de la Sala Superior de San Juan del Tribunal de Primera Instancia, Autoridad de Carreteras y Transportación de Puerto Rico vs. Luis

Alberto Mercado Jiménez. En específico, en lo pertinente a la resolución del presente caso, las partes estipularon, como Exhibit VI y VII, respectivamente, la Moción Reclamando Daños al Remanente y la Segunda Moción Reclamando Daños al Remanente, presentada el 26 de agosto de 2016, entre otros, por Sylvia Margarita Mercado Méndez y Ena Luz Moure De Lis, codemandantes en el presente caso. Allí se planteó que, por efectos de la construcción de la carretera, se depositó relleno sin autorización, según se reclamó, solamente a la Autoridad de Carreteras, en el mes de junio de 2014.

45. La parte demandante ha obrado con desidia y temeridad.

El foro apelado consignó que, de los hechos incontrovertidos y la prueba presentada, se desprendió que, a pesar de que Cantera aceptó que depositó material de terreno sobrante en la finca, la parte apelante conoció sobre la ocurrencia del depósito de relleno en el año 2014. Además, estableció que, la parte apelante no probó la interrupción oportuna del término para demandar al responsable del error en el depósito de terreno.

Particularmente, resolvió que, aun cuando la parte apelante estipuló que conoció sobre el depósito erróneo de relleno en su finca, para el año 2014, no fue hasta el 1ro de febrero de 2017 que presentó su *Demanda*. Sostuvo que a pesar del conocimiento del error y los remedios que debía solicitar, la parte apelante especuló que las gestiones encaminadas para reunirse con los representantes legales de la parte apelada se llevaron a cabo en algún momento no preciso, entre el año 2015 y 2016. Por tanto, concluyó que, la parte apelante no logró establecer que la prescripción fue válidamente interrumpida, en cuanto Ferrovial, Cantera y la aseguradora de ambas, Universal, por lo que la parte apelada reclamó con diligencia la defensa afirmativa de la prescripción. Finalmente, enfatizó que la reclamación sobre daños fue desistida voluntariamente y con perjuicio por la apelante.

Inconforme, la parte apelante presentó su *Moción en Solicitud de Reconsideración de la Sentencia Dictada* en la cual reiteró sus

planteamientos iniciales.[11] De igual forma, apuntó que, Ferrovial era responsable por los actos negligentes de Cantera, compañía subcontratada por este. Ello, pues Ferrovial era la responsable de supervisar a sus subcontratistas.

Evaluada la moción de reconsideración, el 1 de mayo de 2025, el TPI la declaró No Ha Lugar.[12] Específicamente, el TPI añadió que, la prueba demostró que el terreno de la parte apelante estaba intacto. Es decir, que para junio de 2013 cesó el depósito de terreno en la finca de la parte apelante. Respecto a la reclamación por daños continuados, expresó que, era a partir de junio de 2013 que procedía computar el término prescriptivo. No obstante, reiteró que, la parte apelante desistió voluntariamente de la causa de acción en daños, lo cual fue adjudicado mediante *Sentencia Parcial* el 27 de abril de 2021. Así pues, detalló que, aun cuando resultaba inconsecuente establecer la continuidad del daño, la *Demanda* se instó sin interrumpir el término prescriptivo.

En cuanto a la responsabilidad de Ferrovial y Universal, el Tribunal, aclaró que, la cláusula decimocuarta del subcontrato con Cantera disponía lo siguiente: *"serán de exclusiva cuenta del subcontratista el importe de todos los daños y perjuicios que con motivo de la ejecución de los trabajos subcontratados se originen a cualquier tercero"*. Por tanto, el Tribunal concluyó que procedía desestimar la *Demanda* en cuanto a Ferrovial y Universal de conformidad con lo pactado.

Aún inconforme con la determinación del TPI, la parte apelante presentó un *Recurso de Apelación*, en el que esbozó que el TPI incidió en cometer los siguientes errores:

> ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR QUE LA CAUSA DE

---

[11] *Íd.,* Anejo 11, págs. 98-101.
[12] *Íd.,* Anejo 12, págs. 102-107. Archivada y notificad en autos el 5 de mayo de 2025.

ACCIÓN EJERCIDA POR LA PARTE DEMANDANTE-APELANTE ESTABA PRESCRITA.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR QUE AUNQUE NO ESTUVIESE PRESCRITA DICHA CAUSA DE ACCIÓN, LA CODEMANDADA-APELADA FERRROVIAL AGROMAN Y SU ASEGURADORA, UNIVERSAL INSURANCE COMPANY, NO TENÍA RESPONSABILIDAD, EN SU ROL DE CONTRATISTA GENERAL, POR EL ACTO NEGLIGENTE DE SU SUBCONTRATISTA, CANTERA EL TUQUE, INC.

El 6 de junio de 2025, emitimos una *Resolución* concediéndole a la parte apelante el término de cinco (5) días para informar el método de reproducción de la prueba oral. En cumplimiento con lo anterior, el 30 de junio de 2025, la parte apelante presentó una *Moción en Cumplimiento de Orden y Relacionada con la Transcripción de la Prueba Oral*, en la cual informó que se proponía a transcribir la prueba oral. Así las cosas, el 11 de agosto de 2025, la parte apelante presentó la transcripción de la prueba oral. Luego, el 21 de agosto de 2025, Ferrovial y Universal presentaron su *Moción en Cumplimiento de Orden Transcripción de la Prueba Oral*. En esta, informaron a este Tribunal que no tenían objeción a la transcripción, por lo que se tuvo la misma por estipulada. Finalmente, el 25 de agosto de 2025, emitimos una *Resolución* ordenándole a la parte apelada a presentar su alegato en oposición. Conforme ordenado, el 19 de septiembre de 2025, Cantera, Universal y Ferrovial presentaron su *Alegato de la Parte Apelada*.

En vista de los errores imputados, procedemos a discutir las normas jurídicas aplicables a este recurso.

-II-

**A. Daños Continuados**

Nuestro Tribunal Supremo ha reconocido y distinguido diferentes tipos de daños. Entre ellos se encuentran los daños continuos o continuados y los daños sucesivos. El Tribunal Supremo define los daños continuos como aquellos producidos por uno o más

actos culposos o negligentes imputables al actor, coetáneos o no, que resultan en consecuencias lesivas ininterrumpidas, sostenidas, duraderas sin interrupción, unidas entre sí, las cuales al ser conocidas hacen que también se conozca por ser previsible el carácter continuado e ininterrumpido de sus efectos, convirtiéndose en ese momento en un daño cierto compuesto por elementos de daño actual y por tanto cierto". *Rivera Ruiz, et al. v. Mun. de Ponce,* 196 DPR 410, 417-418 (2016). Estos tipos de daños se distinguen por ser daños derivados de acto ilícito como unidad y no como una pluralidad de daños particulares. *Toro Rivera v. ELA*, 194 DPR 393, 417 (2015). Particularmente, el Tribunal Supremo explica que, independientemente de la naturaleza o el tipo de acto u omisión que genere el daño, en el contexto de los daños continuados, el perjudicado se encuentra sufriendo un perjuicio que no ha de cesar y, por el contrario, se ha de repetir hasta que la causa generadora deje de existir. *Rivera Ruiz, et al. v. Mun. de Ponce,* supra, en la pág. 427.

Sobre los daños sucesivos, nuestro Tribunal Supremo sostuvo que estos constituyen una secuencia de daños individuales y concretos que se producen en intervalos finitos de tiempo. *Cacho González et al. v. Santarrosa et al.*, 203 DPR 215, 222-223 (2019). Cada lesión a causa de un acto u omisión culposa o negligente produce un daño distinto, que a su vez genera una causa de acción independiente. *Id.* Se tratan pues de daños ciertos que se van repitiendo, sin que necesariamente sean idénticos, y que no son previsibles o susceptibles de ser descubiertos empleando diligencia razonable. *Id.* Aunque tradicionalmente se han referido a las doctrinas bajo estudio como daños continuos o daños sucesivos, lo que en realidad es continuo o sucesivo en estos escenarios es el acto u omisión que produce el daño y no, necesariamente, la lesión sufrida. *Id.*

Por su parte, los daños continuados tienen tres rasgos distintivos: (1) nace de uno o varios actos culposos o negligentes imputables al mismo actor; (2) los daños ocasionados se manifiestan ininterrumpidamente, y (3) esos daños, en conjunto, conforman un proceso perjudicial progresivo de carácter unitario. *Velázquez Ortiz v. Mun. Humacao, supra,* en las págs. 665-666.

### C. Contratista Independiente

Nuestro Tribunal Supremo ha definido la figura del contratista independiente "como aquella persona que dada la naturaleza de su función y la forma en que presta servicios resulta ser su propio patrono". *Romero et als. v. Cabrer Roig et als.*, 191 DPR 643, 659 (2014).

Como norma general, el Tribunal Supremo de Puerto Rico ha expresado que, la responsabilidad impuesta a un empleador por los daños ocasionados por un contratista independiente constituye una excepción a la norma a los efectos de que la obligación de reparar daños generalmente emana de un hecho propio. *Pons v. Engebretson,* 160 DPR 347, 356 (2003); *véase* Art. 1803 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 5142. Por lo tanto, el empleador del contratista independiente no responde por la negligencia corriente de éste que resulte en daño a una tercera persona, ni por su inobservancia de precauciones de rutina que un contratista cuidadoso debe usualmente tomar. *Martínez v. Chase Manhattan Bank,* 108 DPR 515, 522-523 (1979).

Particularmente, nuestro más alto foro ha expresado que el empleador no debe responder por la negligencia del contratista cunado ésta consista en omitir las medidas de cuidado rutinarias para llevar a cabo la labor que le ha sido encomendada. *Pons v. Engebretson,* supra, en la pág. 358. Tampoco debe imponérsele responsabilidad al empleador cuando la falta de cuidado del contratista independiente no era previsible para el principal. *Id.*

Finalmente, el empleador no debe responder por la negligencia del contratista independiente cuando ejerza la debida diligencia para asegurarse que la persona contratada cuenta con las destrezas y experiencia suficientes para llevar a cabo el trabajo, por lo que es de esperar que tomará las medidas de precaución necesarias para evitar los riesgos que pueda ocasionar la obra. *Pons v. Engebretson,* supra, en la pág. 358-359. En tales circunstancias, se entenderá que el empleador ha actuado como un hombre prudente y razonable al delegar las labores en una persona capacitada para llevar a cabo el trabajo. *Id.*

Ahora bien, cuando se trate de una obra que por su naturaleza implique riesgos particulares, el empleador será responsable por la negligencia del contratista si omite exigirle en el contrato tomar las medidas de seguridad especiales que sean necesarias o, en caso de incluirlas en el contrato, si el empleador no ejerce la debida diligencia para tomar por sí mismo tales medidas de seguridad de alguna forma. *Id.* Es decir, el empleador será responsable por su propia negligencia cuando el trabajo implique riesgos particulares que requiera precauciones especiales y no ejerza su deber de exigirle al contratista tomar las medidas o deje de tomarlas por sí mismo de alguna forma. *Id.*

### D. Apreciación de la Prueba

Como norma general, los tribunales apelativos no intervendremos con la apreciación de la prueba reflejada en las determinaciones de hechos del Tribunal de Primera Instancia en ausencia de circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto. *Gómez Márquez, et als. v. Periódico El Oriental, et als,* 203 DPR 783 (2020); *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 753 (2013); *Serrano Muñoz v. Auxilio Mutuo,* 171 DPR 717 (2007); *Ramos Milano v. Wal-Mart Puerto Rico,* 168 DPR 112 (2006); *Rolón v. Charlie Car Rental,* 148 DPR 420 (1999).

Es decir, los tribunales apelativos deben mantener deferencia para con la apreciación de la prueba que realiza un tribunal de instancia. *McConnell Jiménez v. Palau*, 161 DPR 734 (2004). El fundamento de la deferencia es que el juez de primera instancia tuvo la oportunidad de observar toda la prueba presentada y, por lo tanto, se encuentra en mejor situación que el tribunal apelativo para considerarla. *Sepúlveda v. Departamento de Salud*, 145 DPR 560 (1998). Por tal motivo, este foro debe otorgar deferencia al juzgador de hechos en cuanto a la credibilidad que le otorgó a los testigos. *Gómez Márquez, et als. v. Periódico El Oriental, et als, supra*, pág. 794.

En lo que nos concierne, el estándar de revisión de error manifiesto nos permite sustituir el criterio del tribunal de instancias cuando de la prueba admitida no existe base suficiente para apoyar su determinación. *Íd.* El error manifiesto ocurre cuando de un análisis de la totalidad de las circunstancias, el foro apelativo se convence de que la apreciación de la prueba se distanció de la realidad fáctica o es inherentemente imposible o increíble. *Íd.* Esto es, las conclusiones del tribunal de instancias se consideran claramente erróneas cuando están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida. *Íd.*

A la luz de la normativa jurídica antes expuesta, procedemos a aplicarla a los hechos de este caso.

-III-

En el presente caso, la parte apelante plantea que el TPI incidió al determinar que su causa de acción estaba prescrita. A su vez, en su segundo señalamiento de error, arguye que el foro primario erró al determinar que, aunque no estuviese prescrita la causa de acción, Ferrovial y Universal no tenían responsabilidad como contratista general, por el acto negligente de su subcontratista, Cantera. Le asiste razón.

Un análisis del expediente ante nuestra consideración refleja que, la Autoridad de Carreteras contrató a Ferrovial a los fines de llevar a cabo la construcción de la Carretera PR-9. Por su parte, Ferrovial determinó disponer y reubicar, fuera de los predios del proyecto el terreno sobrante de la construcción de la carretera PR-9. Así pues, Ferrovial subcontrató a Cantera con el propósito de que este reubicara dicho material sobrante en la finca del señor Cales. Ello, con autorización de este. No obstante, Cantera se equivocó y depositó alrededor de 40,000 metros cúbicos de terreno sobrante de la construcción en la finca de la parte apelante sin contar con su autorización para ello. Cabe precisar que, en su *Contestación a la Segunda Demanda Enmendada*, Cantera aceptó que depositó el material de relleno sobrante en la finca de la parte apelante.

Por su parte, de la transcripción de la prueba oral surge que, el Sr. Rafael Rodríguez Zayas (señor Rodríguez), desarrollador de la finca en controversia, declaró que Cantera se comprometió a mover el material de relleno ubicado en la fina de la parte apelante. Además, explicó que Cantera estuvo en la finca por una semana con el propósito de remover el relleno. No obstante, indicó que Cantera no culminó la remoción del terreno por falta de dinero. Además, enfatizó que, el terreno estaba intacto, refiriéndose al depósito de relleno.[13]

Según el derecho previamente expuesto, los daños continuos son aquellos producidos por uno o más actos culposos o negligentes imputables al actor, coetáneos o no, que resultan en consecuencias lesivas ininterrumpidas, sostenidas, duraderas sin interrupción, unidas entre sí, las cuales al ser conocidas hacen que también se conozca por ser previsible el carácter continuado e ininterrumpido de sus efectos, convirtiéndose en ese momento en un daño cierto compuesto por elementos de daño actual y por tanto cierto". *Rivera*

---

[13] TPO del 18 de octubre de 2023, págs. 9-11.

*Ruiz, et al. v. Mun. de Ponce, supra.* Particularmente, el Tribunal Supremo explicado que, independientemente de la naturaleza o el tipo de acto u omisión que genere el daño, en el contexto de los daños continuados, el perjudicado se encuentra sufriendo un perjuicio que no ha de cesar y, por el contrario, se ha de repetir hasta que la causa generadora deje de existir. *Rivera Ruiz, et al. v. Mun. de Ponce,* supra, en la pág. 427.

Al analizar los hechos a la luz de la norma discutida, concluimos que la causa que genera el daño por lo que se reclama en este caso es de carácter continuo. Nótese que, hasta tanto Cantera no remueva dicho material en su totalidad, la parte apelante está impedida de desarrollar y utilizar su finca. Dicha situación causa graves daños a la finca de la parte apelante, toda vez que, según se alega, dicho relleno afectó su topografía y el drenaje natural de las aguas escorrentías. Por tanto, es forzoso concluir que la *Demanda* no está prescrita, puesto que no se han verificado los últimos actos u omisiones ni se ha producido el resultado definitivo del daño. Más bien, nos encontramos ante una causa de acción que se regenera día a día mientras subsista dicho material de relleno en la finca de la parte apelante. En virtud de lo anterior, resolvemos que el primer señalamiento de error se cometió.

En cuanto a su segundo señalamiento de error, del expediente ante nuestra consideración surge que, Ferrovial subcontrató a Cantera con el propósito de que este reubicara alrededor de 40,000 metros cúbicos de terreno sobrante de la construcción de la carretera PR-9 en la finca del señor Cales. No obstante, Cantera aceptó que se equivocó y depositó dicho material en la finca de la parte apelante sin contar con su autorización. Cabe precisar que, el contrato entre Ferrovial y Cantera se suscribió el 27 de septiembre de 2012. Particularmente, la cláusula decimocuarta del subcontrato disponía que: *"[s]erán de exclusiva cuenta del Subcontratista el importe de todos*

*los daños y perjuicios que con motivo de la ejecución de los trabajos subcontratados se originen a cualquier tercero".*

De otra parte, de la prueba testifical surgió que el Sr. Oscar Santiago Díaz, (ingeniero Santiago) ingeniero de Ferrovial identificó como subcontratista a Cantera. Asimismo, declaró que, en los proyectos de construcción, había un permiso general consolidado, por lo que tenían que saber cuáles eran los lugares en los que iban a depositar el sobrante de material. Añadió que, en sus comienzos, el proyecto únicamente tenía dos (2) lugares como depósito y eventualmente se concedió un tercer permiso, la finca del señor Cales. Respecto a las funciones relacionadas a la disposición del material, el ingeniero testificó que no tenía jurisdicción, toda vez que era una gestión fuera del proyecto. Aclaró que, entre las funciones y precauciones suyas, no estaba descartar algún tipo de corroboración de que se depositara en una finca distinta, porque eran lugares fuera del proyecto.

No obstante, testificó que, se cursó más de una carta al representante de Cantera para solicitar el permiso depósito de material en el lugar de la controversia. Sostuvo que dichas cartas se remitieron al señor Golderos, cuando observó las fotos aéreas del perímetro del proyecto. Específicamente, señaló que, las fotos reflejaban que el área en controversia cambió de color y, tenía conocimiento de que no era un lugar designado para botar material. Por último, explicó que, remitió las cartas a Cantera, puesto que, como parte de sus obligaciones, tenía que evidenciar que Cantera tenía los permisos de los botaderos.[14]

Como norma general, la responsabilidad impuesta a un empleador por los daños ocasionados por un contratista independiente constituye una excepción a la norma a los efectos de

---

[14] TPO del 18 de octubre de 2023, págs. 19,23-24,27-28.

que la obligación de reparar daños generalmente emana de un hecho propio. *Pons v. Engebretson,* supra. Así pues, el empleador no debe responder por la negligencia del contratista independiente cuando ejerza la debida diligencia para asegurarse que la persona contratada cuenta con las destrezas y experiencia suficientes para llevar a cabo el trabajo. *Pons v. Engebretson,* supra. Ahora bien, el empleador será responsable por su propia negligencia cuando el trabajo implique riesgos particulares que requiera precauciones especiales y no ejerza su deber de exigirle al contratista tomar las medidas o deje de tomarlas por sí mismo de alguna forma. *Id.*

De los hechos y de la transcripción de la prueba oral surge, que, Ferrovial contrató a Cantera con el único propósito de remover el material de relleno sobrante de la construcción de la Carretera PR-9, por lo que no nos convence el argumento de la parte apelada al plantear que al suscribir el contrato los eximía de toda responsabilidad ante un tercero, en este caso, la parte apelada.

De ordinario, remover dicho material conlleva unos riesgos particulares que requieren que se tomen medidas para evitar errores. De igual forma, entre las responsabilidades que tenía Ferrovial como parte del proyecto era cerciorarse de que Cantera contara con los permisos de los lugares en los cuales se disponía a depositar dicho material. Ello, con el propósito de conocer en donde se dispuso del material sobrante. Evidentemente, Ferrovial desconocía que Cantera se disponía a depositar el sobrante en la finca del señor Cales. No es hasta que advino en conocimiento de que el material se depositó en una finca equivocada, que solicitó a Cantera el permiso de depósito de la finca del señor Cales. Es decir, Ferrovial contrato a Cantera para remover el material, sin embargo, no tenía conocimiento con relación a donde se depositó dicho material, y desconocía si el mismo fue depositado en los lugares para los que tenía un permiso aprobado. Por otra parte, no surge que Ferrovial presentó prueba con relación a

si Cantera era una compañía experimentada y contaba con los conocimientos para remover el material sobrante de la construcción de la Carretera PR-9.

Por todo lo anterior, colegimos que Ferrovial no actuó como un hombre prudente y razonable, puesto que, no realizó las diligencias necesarias para corroborar si Cantera estaba apta para realizar la obra para la cual fue contratada. Así pues, determinamos que, este no descargó su responsabilidad al contratar a Cantera. Nótese que, al desligarse de su función de supervisión, el material se depositó en la finca de la parte apelante causando daños. Así pues, resolvemos que el segundo señalamiento de error se cometió.

No podemos olvidar que, como norma general, los tribunales apelativos no intervendremos con la apreciación de la prueba reflejada en las determinaciones de hechos del Tribunal de Primera Instancia en ausencia de circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto. *Gómez Márquez, et als. v. Periódico El Oriental, et als*, supra. No obstante, el estándar de revisión de error manifiesto nos permite sustituir el criterio del tribunal de instancias cuando de la prueba admitida no existe base suficiente para apoyar su determinación. *Íd.* El error manifiesto ocurre cuando de un análisis de la totalidad de las circunstancias, el foro apelativo se convence de que la apreciación de la prueba se distanció de la realidad fáctica o es inherentemente imposible o increíble. *Íd.* Esto es, las conclusiones del tribunal de instancias se consideran claramente erróneas cuando están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida. *Íd.*

-IV-

Por los fundamentos que anteceden, se revoca el dictamen apelado. Se ordena la devolución al foro primario para la adjudicación de las causas de acción ante sí, superados los asuntos de la supuesta

prescripción de la causa y la posible ausencia de responsabilidad de Ferrovial por los actos del contratista independiente Cantera.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones